IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Civil Action No. 10-cv-2404-WJM-CBS

-----------------------------------------x

HOMAIDAN AL-TURKI,

Plaintiff,

v.

JOSEPH BALLARD, a Corrections Officer at Limon Correctional Facility, in his individual capacity; BOB EBERLE, a Corrections Officer at Limon Correctional Facility, in his individual capacity; RICHARD HOWARD, a Corrections Officer at Limon Correctional Facility, in his individual capacity; HECTOR LOZANO, a former Corrections Officer at Limon Correctional Facility, in his individual capacity; DAVID MAGGARD, a former Corrections Officer at Limon Correctional Facility, in his individual capacity; MARY SUSAN ROBINSON, RN, former Nurse for Limon Correctional Facility, in her individual capacity; WILLIAM RUSHER, a Captain and Staff Duty Officer at Limon Correctional Facility, in his individual capacity; JOHN STIREWALT, a former shift commander for Limon Correctional Facility, in his individual capacity; HOWARD SUTTCLIFFE, a Corrections Officer at Limon Correctional Facility, in his individual capacity;

Defendants.

-----------------------------------------x

February 27, 2012
9:48 a.m.

DEPOSITION of a non-party witness, ROBERT GREIFINGER, M.D., taken by the Parties Present, pursuant to Agreement, held at the offices of Veritext Reporting, LLC, 1250 Broadway, New York, New York, before Abner D. Berzon, a Registered Professional Reporter, Certified Realtime Reporter and Notary Public of the State of New York.



EXHIBIT
A-6

GREIFINGER

Q. It's not ringing a bell?

A. Not ringing a bell.

Q. Other than the Rice case, the Mallory case, the Al-Turki case, and the Carranza-Reyes case, have you done any other work as an expert in Colorado?

A. Not that I recall.

Q. Have you done any work as a consultant in Colorado for the Department of Justice or anybody else?

A. No.

Q. Have you ever done an audit of any correctional facility in the State of Colorado?

A. I don't believe so.

Q. Have you ever been in a correctional facility in the State of Colorado?

A. No.

Q. Have you ever been in any facility operated by the Colorado Department of Corrections?

A. No.

Q. Have you ever been not allowed,

GREIFINGER

requires board approval, from your -- from your understanding?
A. As far as I know.
Q. But until you go to a meeting, you may not know what the agenda is at a meeting or anything like that?
A. I have no idea.
Q. Understood. Okay.
Other than those changes that you just mentioned, is everything else in your CV that was provided in December of last year accurate?
A. Yes.
Q. Do you have any additional publications that have happened in the first quarter of 2012?
A. I have a publication; it's due out very soon in the American Journal of Public Health on elderly prisoners.
Q. Okay. Have you ever -- I didn't -- I went through your publications list and I didn't see anything on the topic of kidney stones. Have you ever written anything on the

GREIFINGER

topic of kidney stones?

A. No.

Q. Did you ever have any particular academic interest in the topic of kidney stones?

A. No.

Q. Have you ever treated a patient who had kidney stones?

A. I don't recall.

Q. My understanding -- and correct me if I'm wrong -- was that, prior to your work in corrections, you were a pediatrician; is that fair?

A. That's correct.

Q. That was what you did your residency in?

A. Yes.

Q. When --

A. Excuse me. My residency was in pediatrics and social medicine.

Q. Okay.

A. And I did hands-on practice until 1985 and I haven't done any hands-on practice since that time.

GREIFINGER

Q. Okay.

A. I think the last time I treated adults was 1974.

Q. Okay. And --

A. Just to get all of that out of the way.

Q. Fair enough. You anticipated where I was going.

MR. ROGERS: You've done this before, haven't you?

Q. In 1974, you were in the Public Health Service; correct?

A. Yes.

Q. And that's the last time you treated anybody who was an adult?

A. Essentially, yes.

Q. Directly, providing patient care patient care, yourself?

A. Yes, other than friends and family, that's correct.

Q. Fair enough. And you don't remember -- however long that is -- 38 years ago -- whether you treated someone with kidney stones or not? It's not

GREIFINGER

Q. Okay. So it has to be a kidney stone of sort of that significance?

A. Yes. Subst-- very large.

Q. Have you ever worked as a correctional officer?

A. No. But I've been a peace officer.

Q. When were you a peace officer?

A. From June of 1989 until March of 1995.

Q. Did you go through any training to be a peace officer?

A. I did.

Q. What kind of training did you go through?

A. I had a two-week intensive training program in peace officer school, which was operated by the New York State Department of Correctional Services, and received my peace officer certificate and qualifications to carry and use weapons, including the use of deadly force.

Q. Okay.

A. And I maintained that, my

GREIFINGER

A. Yes.

Q. When you were the deputy commissioner and chief medical officer, did you supervise correctional officers?

A. I worked very closely with correctional officers, but I didn't have direct supervision.

Q. Was there a deputy commissioner who was -- I don't know, something like the chief operating officer that was in charge of the correctional officers?

A. Yes.

Q. Who was that person when you were working at the department of correctional services?

A. That was Glenn Goord.

Q. Can you spell Mr. Goord?

A. G-o-o-r-d, and Glenn with two n's.

Q. And did Mr. Goord hold that position throughout your tenure as deputy commissioner or was there some -- another occupant in that position?

A. I believe he was there

facility; correctional healthcare staff are responsible to provide timely access to an appropriate level of care; custody staff and healthcare staff, when working well, work together as a team and to coordinate the various public safety functions.

Public health is public safety, and security is public safety, and so there is a tremendous amount of overlap.

Q. Is it fair to say that, typically in correctional facilities, there are separate chains of command of custody staff, correctional staff, and healthcare staff?

A. Typically, there are separate chains of command which come together at the level of the warden or the facility administrator in a state prison. And while there may be clinical chains of command that go to the central office, the administrative chain of command comes together at the level of the facility administrator.

GREIFINGER

Q. Okay. But not lower than that?
A. Sometimes it's the deputy warden.
Q. A deputy or an associate warden?
A. Yes.
Q. Okay. Would it ever go down to the level of a shift commander?
A. Now I lost track of what the original question was. Are you asking me whether the --
Q. The chain of command --
A. -- the interface between chains of command of healthcare and custody would ever be at the level of the shift commander? And the answer is no, not typically.
Q. Do you know whether it's at the level of a shift commander at state prisons operated by the Colorado Department of Corrections?
A. I don't know for sure.
Q. Have you looked at any statute of Colorado law about the operations, duties, responsibilities of anybody in the

GREIFINGER

Colorado Department of Corrections?

A. Colorado Department of Corrections? I don't believe so.

Q. Have you looked at any administrative regulation of the Colorado Department of Corrections?

A. The only documents that I looked at are listed in my report.

Q. Okay.

A. So if it's not listed there, the answer would be no.

Q. Okay.

A. Certainly not in the context of this case.

Q. Fair enough.

Are there any circumstances where it would be appropriate for a healthcare provider to make a decision about a security issue?

A. Healthcare people always have to keep security in mind, because they work in a prison, and some prisoners can be dangerous, but typically -- well, not "typically"; healthcare providers should

GREIFINGER

sure the answer to that is no.

Q. Have you ever spoken to Mr. Al-Turki?

A. No.

Q. Did you perform a site visit of the Limon Correctional Facility?

A. No.

Q. Did you have any -- were there any information gaps that you had related to this case?

MR. BRENNAN: Let me just -- objection. Vague.

MR. RINGEL: I assume that's a form objection?

MR. BRENNAN: It is a form objection.

MR. RINGEL: Thank you.

A. I -- if you're asking me was there any information that I wished I had before putting my opinions on paper, the answer is no. There are always information gaps, because we don't all have everything and know everything.

Q. That is a very true statement.

Q. So the only basis you have for the statement beginning, "His cellmate, Jason Steele, likewise called for help at approximately 9:05 p.m." is the third amended complaint; is that correct?
A. Yes.
Q. You were critical of defendant Stirewalt, the shift commander, for not coming to see Mr. Al-Turki directly; true?
A. Yes.
Q. How many inmates are at Limon Correctional Facility, or were at Limon correctional facility on October 5th and 6 is this of 2008?
A. I don't know.
Q. How many staff members was Mr. Stirewalt in charge of on those two -- or that evening into the next morning?
A. I don't know.
Q. Do you know what else was going on for Mr. Stirewalt as the shift commander on that evening?
A. No.
Q. Would you expect a shift

that he had not been treated properly; right?

A. Yes.

Q. Do you have any understanding of who the health services administrator concluded and told Mr. Al-Turki had not treated him properly?

A. No.

Q. None of the correctional staff was disciplined by the Colorado Department of Corrections for any of their actions in this case; correct?

A. That's correct, as far as I know.

Q. Do you believe discipline of all of the correctional staff defendants would have been appropriate in this case?

A. I have no opinion on that.

Q. Why not?

A. I don't know what the CDOC expectations are and I have not seen their training, so I cannot -- I don't have enough basis to form an opinion as to whether this violated policy.

GREIFINGER

"People who are not imprisoned who suffer the symptoms of kidney stones usually seek immediate medical attention and often go to emergency rooms." What is the basis of that statement?

A. That's just my experience.

Q. Your general experience as a human being and as a physician?

A. That's correct.

Q. Did you do any research into the literature of kidney stones in preparation or in conjunction with the preparation of your report or supplemental report in this case?

A. No.

(Mr. Rogers returns.)

Q. The next sentence in paragraph 44 says, "People suffering from kidney stones are sometimes nauseated from the associated pain." What is the basis of that statement?

A. The basis of that is that severe pain is frequently associated with nausea. Any pain.

of mind.

Q. Your expert opinion is each of the individual defendants failed the subjective test for deliberate indifference?

A. Yes, with the qualification of reconciliation of the facts on who knew what when the -- through the course of the shift change, yeah.

Q. How does your conclusion that the individual defendants failed the subjective, or, for that matter, the objective part of the deliberative -- the deliberative indifference inquiry differ from what a fact finder who was actually trying this case would have to conclude?

MR. BRENNAN: Objection as to form.

A. I'm sorry. I don't the question. Could you rephrase it.

Q. Sure. You have just told me that you believe that each of the individual defendants subjectively violated Mr. Al-Turki's rights because

they were deliberately indifferent; right?
A. Yes.
Q. Isn't a fact finder, either a judge or a jury in this case, going to have to make the determination about whether or not any of the defendants were deliberately indifferent from both an objective and a subjective point of view.
MR. BRENNAN: Object to form.
A. Yes. That's my understanding.
Q. And why are you competent to make that determination that either a judge or a jury would have to make?
A. I form the opinion that he had a serious medical need, and that in the case of the -- each defendant, that they knew Mr. Al-Turki had a serious medical need they made a choice which denied Mr. Al-Turki timely access to an appropriate level of medical care for his serious medical need. And then, from that, I conclude that that was deliberate indifference.
I understand that in some

GREIFINGER

consistent with nationally accepted standards.

Q. In conjunction with your retention in this case, it is true that you have not reviewed any Colorado Department of Corrections regulations or policies or procedures; isn't that true?

A. I believe so, yes.

MR. ROGERS: Why don't we take a brief break.

(Time noted: 12:42 p.m.)

(Recess.)

did?
A. 1985.
Q. Have you ever published or contributed to the publication of any article or treatise or chapter or anything in the area of urology?
A. No.
Q. Other than whatever training you had generally in medical school, have you ever received any type of specialized training in the field of urology?
A. No.
Q. At any time in your work as a physician, did you spend time in an emergency room or any other type of hospital triage dealing with patients who were presenting with urologic compromise or renal difficulties?
MR. BRENNAN: Objection to form.
A. Well, during my training, I spent a considerable amount of time working in the emergency rooms.
Q. As part of an internship or a

GREIFINGER

residency?

A. Yes. And then I took emergency call from 1972 to 1974 in hospitals in Rock Island and Moline, Illinois, where they did not have full-time emergency physicians at the time.

Q. Have you ever been responsible for providing any type of direct urologic care to any patients who are incarcerated?

A. No.

Q. I assume, by extension, you've never been directly responsible for providing treatment to any patient for kidney stones in any type of incarcerated situation; is that correct?

A. Correct.

Q. You talked a little bit with Mr. Ringel about Dr. Flynn's report and your observations of it. Do you have any reason to question Dr. Flynn's qualifications as a urologist and medical school professor in the discipline of urology?

A. No.

understanding of what symptoms he might have been demonstrating, those were at least possibilities in the medical spectrum?

MR. BRENNAN: Objection, form.

A. Yes.

Q. Whereas Dr. Flynn has looked back and said, okay, this is what really happened to him, I've looked at the medical records, this is what he actually experienced; fair?

MR. BRENNAN: Objection, form.

A. Yes.

Q. Your concern, looking back at it, and your criticisms, looking back at it, is more these are things he could have suffered from, even though he didn't; right?

MR. BRENNAN: Objection, form.

A. Yes.

Q. You defined for Mr. Ringel your understanding as to what "deliberate indifference" means and I'm not going to ask you to redo that, or restate that, but

deliberate indifference is not something that's taught in medical school, is it?

A. I don't recall learning about it in medical school.

Q. It's not a medical term, is it?

A. It's not a medical term.

Q. It's a legal term?

A. It's a legal term.

Q. And, as I think you've already stated, you have no background, training, or experience as an attorney.

A. That's correct.

Q. You have no legal training.

A. I have not trained in a law school.

Q. You have had significant exposure to the law by virtue of your work as a consultant and an expert witness; correct?

A. Yes. And also as a defendant and as a correctional healthcare administrator and correctional agency executive.

Q. Okay. So as an executive, as a

that you've expressed in your reports?

A. I think if this is new onset problem --

Q. I'm sorry?

A. If this a new onset of a problem with kidney stones, it would have been appropriate for him to have a full clinical assessment, including a physical examination, and attendance to his state of hydration, which, more likely than not, would have shortened the -- his duration of pain.

Q. You say "more likely than not". Are you aware of any studies or publications that support the statement that you just made as applicable to Mr. Al-Turki's circumstances?

A. No.

Q. That's just your opinion, based on your urologic experience as a physician --

MR. BRENNAN: Objection, form.

Q. -- and based upon being a pediatrician?

GREIFINGER

him; fair?

A. Yes.

Q. And with regard to both of those things, less pain and shorter duration, you would agree with me that you can't quantify or give any estimate as to what that might have amounted to, in terms of decreased pain or decreased duration; fair?

A. That's correct.

Q. No matter what happened to him on that particular evening, he was going to have some level of pain until those kidney stones were passed; fair?

A. Yes.

Q. And nobody is qualified as an expert to quantify what decreased pain or decreased duration may have been occasioned had the type of care and response that you believe should have taken place occurred on that evening; fair?

MR. BRENNAN: Objection.

A. I don't understand what you're

asking me.

Q. Nobody could possibly opine, to any level of probability, the amount of any type of suggested decreased pain or the decreased duration of this kidney stone event; you can't, nor can anybody else?

MR. BRENNAN: Objection, form.

A. I can't speak for anybody else.

Q. You certainly can't; fair?

A. Correct.

MR. ROGERS: Christine, I think I'm about done. I'm just looking through my notes real quickly.

MS. HAYTER: Okay.

(Pause.)

Q. One of the things that you said when responding to Mr. Ringel's questions is that you think one of the things that happened here was just a miscommunication between the custody staff and the healthcare staff. Did I hear you correctly?

MR. BRENNAN: Objection to

GREIFINGER

Q. And I understand your earlier testimony indicating that you have not held a position as a corrections officer; is that correct?

A. That's correct.

Q. And you have not been involved in the security aspects of running a correctional facility such as Limon Correctional facility; is that correct?

MR. BRENNAN: Objection, form.

A. No, that's not correct. I was very closely involved in security aspects of facility operations, particularly during my tenure as deputy commissioner of the New York State Department of Correctional Services, and since I left there 17 years ago, I've been very closely involved with the inter-- at the interface between custody staff and correctional healthcare staff.

Q. Do you know what level of facilities Limon Correctional Facility is?

A. No.

Q. Do you know what -- how the

Limon Correctional facility does its inmate count?

A. No.

Q. Do you know the duties of a staff duty officer when a correctional officer is a staff duty officer while working at the Limon Correctional Facility?

A. I recall testimony from one of the defendants about -- in that area, and I seem to recall it was someone who was second in command to the shift commander.

Q. So other than looking at the depositions of the parties in this case and --

A. And excuse me, I may have gotten that confused with the position of the supervisor of the shift commander, and that would be the captain. I don't recall.

Q. Okay. Do you know what Mr. Al-Turki did in the morning hours of October 6, 2008 prior to going to his medical appointment?

GREIFINGER

generally dealt with on an urgent basis.

Q. So it's the inmate that decides the level of urgency by utilizing a written versus a verbal form of communication of his complaint?

MR. BRENNAN: Objection, form.

A. They do.

Q. Alright. You were asked a few questions about whether hydration, or increased hydration, can diminish the level of any potential injuries sustained by the ureter or the urethra. Do you recall that question?

A. Oh, yes. I said ureter.

Q. Ureter. Hydration can shorten the period of time until a kidney stone is passed. You're aware of no medical evidence or medical writings or medical support for the proposition that increased hydration can decrease the potential for injury that a kidney stone might cause on its way out, are you?

A. No. I'm sure Dr. Flynn would know the answer to that, but I don't.