ROBERT B. GREIFINGER, M.D.

January 3, 2012

Gail K. Johnson, Esq.
Johnson & Brennan, PLLC
1401 Walnut St., Ste. 201
Boulder, CO 80302

Re: Homaidan Al-Turki v. Joseph Ballard, et al.

Dear Ms. Johnson:

This is a supplemental report on the medical care provided to Homaidan Al-Turki at the Limon Correctional Facility (LCF) of the Colorado Department of Corrections (CDOC) on October 5 and 6, 2008. My opinions are based on the materials I have reviewed. My opinions are expressed to a reasonable degree of medical certainty. If I receive any additional materials, I may choose to further supplement my report.

**Background**

**1.** I am a physician licensed in New York. I have been a physician since 1971. I have practiced in the field of correctional medicine for the past 20 years. From 1987 to 1989, I managed the medical care at Rikers Island, New York City's jail. From 1989 until 1995, I was the Chief Medical Officer for the New York State Department of Correctional Services. Directing a staff of 1,100 and a budget of $140 million, I was accountable for all inmate health services in a system with 68,000 inmates.

**2.** From 1995 until the present, I have consulted in the design, management, and quality improvement programs for correctional health care systems. As part of this work, I was a court-appointed monitor for the medical care in the jails in Philadelphia, Fulton County, Georgia, DeKalb County, Georgia, and Albuquerque, New Mexico. Until recently, I was the court monitor for the Alabama prison for women. I currently monitor the medical care in the New Mexico juvenile system and I have a court appointment to monitor the medical care in the Metropolitan Detention Center in Albuquerque, NM. I monitor multiple jails and prison correctional health care systems for the Civil Rights Division of the United States Department of Justice. I am a consultant to the Office of Civil Rights and Civil Liberties of the Department of Homeland Security. I have consulted on correctional health care issues in 36 states.

ROBERT B. GREIFINGER, M.D. (646) 559-5279
380 RIVERSIDE DRIVE, APT 4F
NEW YORK, NY 10025 BOB@RGREIFINGER.COM

**3.** As the principal investigator for a study and report issued by the National Commission on Correctional Health Care in 2002, I made recommendations to Congress on identifying public health opportunities for soon-to-be-released inmates. In addition, I am a consultant on public health issues in corrections for the Centers for Disease Control and Prevention. I have written numerous articles in the field and I am an associate editor and author of one chapter in the Second Edition of *Clinical Practice in Correctional Medicine*, published in 2006. I am the editor of *Public Health Behind Bars: From Prisons to Communities*, a textbook published by Springer in 2007.

**4.** I am Professor (Adjunct) of Health and Criminal Justice and Distinguished Research Fellow at the John Jay College of Criminal Justice.

**5.** A more detailed listing of my experience in correctional health care, my participation in the development of national correctional policy and standards, my experiences as a consultant and expert witness, and a list of my publications are included in my curriculum vitae, which is attached. I have also attached my fees for this case and a list of testimony within the past four years.

**6.** I am familiar with conditions of confinement, health status, and health care for prisoners in correctional facilities such as those operated by the CDOC, both generally and under the same or similar circumstances and surrounding conditions that involved Mr. Al-Turki on October 5 and 6, 2008.

**Materials Reviewed**

**7.** Third Amended Complaint (Doc. 79);

**8.** Answer to Third Amended Complaint of Defendants Ballard, Lozano, Maggard and Stirewalt (Doc. 76);

**9.** Answer to Third Amended Complaint of Defendant Mary Sue Robinson (Doc. 75);

**10.** Answer to Third Amended Complaint of Defendants Chatterton, Eberle, Howard, Rusher and Sutcliffe (Doc. 86);

**11.** Responses of Ballard, Lozano, Maggard, Robinson, and Stirewalt to Plaintiff's First Interrogatories;

**12.** Mr. Al-Turki's grievances and associated CDOC responses regarding the events of October 5 and 6, 2008 (HAKS00000230-246);

**13.** Incident reports prepared by Maggard, Robinson, and Stirewalt (DOC/Al-Turki0001-3);

**14.** Correspondence between attorney John Richilano and Warden Travis Trani, dated October 6, 2008 and October 10, 2008 (HAKS00000015-17);

**15.** Mr. Al-Turki's CDOC medical records (Robinson000001-346); and

**16.** Deposition transcripts and exhibits for Lozano (June 7, 2011); Maggard (June 20, 2011); Robinson (June 24, 2011); Stirewalt (July 6, 2011); Al-Turki (November 19, 2011);

Sutcliffe (November 3, 2011); Rusher (October 25, 2011); Eberle (October 27, 2011); Chatterton (November 1, 2011); Howard (October 28, 2011); and Ballard (October 21, 2011).

**Findings**

**17.** Mr. Al-Turki was a prisoner at LCF, operated by the CDOC. Among other conditions, he had diabetes and elevated cholesterol for which he was being treated. (Al-Turki depo. pp. 17, 164.) Diabetes is a serious medical need. [1]

**18.** At approximately 8:35 P.M. on October 5, 2008, Mr. Al-Turki developed severe abdominal pain and nausea for which he called for help on the intercom at approximately 8:50 p.m. (Doc. 79, ¶¶ 18-22; Al-Turki depo. pp. 118-21.) Severe abdominal pain is also a serious medical need. His cellmate, Jason Steele, likewise called for help at approximately 9:05 P.M. (Doc. 79, ¶¶ 24, 47.) Defendant Maggard was in the control room and responded by calling Defendant Mary Robinson, RN, who was on duty that evening in the on-site LCF medical clinic (DOC/Al-Turki 0001-0003; Maggard depo. pp. 8, 65, 79, 104). Defendant Robinson refused to see her patient and made no further inquiries as to the nature and extent of his condition. (Robinson depo. pp. 19, 117, 123; Maggard depo. p. 71.)

**19.** Although Defendant Robinson does not recall other calls, Defendant Lozano called her on two occasions. (Lozano depo. pp. 28, 30, 31.) Defendant Lozano personally observed Mr. Al-Turki on two occasions, once in the company of Defendant Ballard. (Lozano Response to Interrogatories pp. 4-5; Lozano depo. pp. 31-32, 60.) Both Defendant Maggard and Defendant Lozano notified the swing-shift shift commander, Defendant Stirewalt, who said he would notify the nurse and then come to Mr. Al-Turki's housing unit. (Maggard Depo. p. 79; Lozano depo. pp. 30-31.) Although Defendant Stirewalt did go to see Defendant Robinson to discuss Mr. Al-Turki's complaint of pain, he did not go to Mr. Al-Turki's housing unit. (Stirewalt depo. p. 233; Maggard depo. p. 80.) Defendant Maggard testified that he also notified Defendant Chatterton and another correctional officer, Defendant Eberle, of Mr. Al-Turki's condition at shift change. (Maggard depo. p. 91.)

---

[1] A serious medical need is a valid health condition that, without timely medical intervention, will cause (1) unnecessary pain, (2) measurable deterioration in function (including organ function), (3) death, or (4) substantial risk to the public health. (Greifinger RB. Health Care Quality Through Care Management, M. Puisis (ed). *Clinical Practice in Correctional Medicine, Second Edition*. St. Louis. Mosby 2006: p. 512.)

**20.** Mr. Al-Turki asked to see the shift commander at 8:45 p.m., but this never came about. (Doc. 79, ¶¶ 53, 76, 78, 83-84; Al-Turki depo. pp. 255-56; Stirewalt depo. p. 15-16, 128, 157, 233; Maggard depo. p. 80.) Defendant Lozano testified that Mr. Al-Turki had reported feeling abdominal pain and was holding his abdomen and supporting himself against the wall of his cell. (Lozano depo. pp. 25, 30, 33, 50). Defendant Lozano informed Defendant Robinson that Mr. Al-Turki was experiencing abdominal pain. (Lozano depo. p. 29). Defendant Robinson instructed Defendant Lozano to tell Mr. Al-Turki to "kite" to be seen in the morning.[2] (Lozano depo. p. 61.) Defendant Lozano described himself as having felt "shocked" that Defendant Robinson refused to see Mr. Al-Turki on the night of October 5, 2008. (Lozano depo. p. 29.)

**21.** Defendant Maggard testified that when he spoke to Mr. Al-Turki on October 5, 2008, it seemed to him that Mr. Al-Turki was in pain. (Maggard depo. pp. 61, 77.) Mr. Al-Turki testified that he asked to see the shift commander, but was told that neither the nurse nor the shift commander were going to do anything despite knowing that he was in severe pain. (Al-Turki depo. pp. 255, 256, 327, 330-31, 336, 339, 369.)

**22.** Mr. Al-Turki testified that he also had begged Defendant Ballard for help. (Al-Turki depo. p. 345.)

**23.** Defendant Robinson testified that she was aware that Mr. Al-Turki might have continued pain and might need to be transported to an outside hospital. (Robinson depo. pp. 139, 147, 192; incident reports, DOC/Al-Turki0001-3) She testified that she did not go to see her patient or have him bought to the medical unit because it was near the end of her shift, although she had close to one hour remaining on her shift when she got the call. (Robinson depo. pp. 19, 26, 109, 116, 183; Robinson response to interrogatories p. 2.) Without any face-to-face assessment or physical examination, Ms. Robinson testified that she assumed that Mr. Al-Turki's condition was not life threatening and that therefore, by policy, she was not required to see her patient. (Robinson depo. p. 117, 140.)

**24.** Defendant Robinson testified that, by policy and practice, prisoners would not be seen on their housing units unless it was a life-threatening emergency. (Robinson depo. pp. 82-83, 140, 187.) Ms. Robinson testified that there was no nurse on duty in the facility during the "graveyard shift," and that prisoners such as Mr. Al-Turki who were locked down in their cells for the night would have to wait until 4:45 a.m. to be seen, unless the on-call nurse was summoned. (Robinson depo. p. 142.)

**25.** Defendant Robinson testified that prescription-strength pain relieving medications were available at the medical unit and that she had the authority to provide such prescription strength pain relieving medicals to inmates in compliance with appropriate protocols. (Robinson depo. pp. 103-108, 174-175.)

---

[2] "Kite" is a term used in some prisons to mean file a written request for medical care.

**26.** Defendant Robinson testified that the CDOC had nursing protocols that guided inquiry into conditions such as abdominal pain and guided expectations for physical assessment, but that she did not follow these protocols with respect to Mr. Al-Turki. (Robinson depo. pp. 88-100.)

**27.** Defendant Robinson testified that on the evening of October 5, 2008, she had concerns about what she perceived to be her patient's escape risk if he required a medical emergency transport from LCF to the small local hospital in Hugo, Colorado, or to a larger hospital in Denver, Colorado. (Robinson depo. pp. 18, 132-133, 192, 194-196.) Defendant Rusher testified that medical staff was not to be involved in custody decisions. (Rusher depo. pp. 82, 84.) However, Defendant Robinson also acknowledged that seeing Mr. Al-Turki at the LCF medical clinic presented no escape risk and that her concerns in this regard did not impact her decision not to see Mr. Al-Turki at the LCF medical clinic. (Robinson depo. pp. 132-33, 194.)

**28.** Defendant Robinson testified that she knew that diabetics can have life-threatening complications, such as diabetic ketoacidosis, stroke, and heart attack, for which pain may be an initial symptom. (Robinson depo. pp. 178-79.)

**29.** Defendant Robinson testified that she was aware of other life-threatening conditions, such as acute abdomen, bowel obstruction (ileus), peritonitis, appendicitis, and pancreatitis, for which abdominal pain may be an initial symptom. (Robinson depo. pp. 180-81.)

**30.** Defendant Robinson testified that she was aware that kidney stones can be very painful, that diabetes can cause dehydration and that hydration can shorten the duration and severity of pain from kidney stones, yet she made choices not to see her patient who she knew had diabetes and pain. (Robinson depo. pp. 161, 167, 170, 174, 178-79.)

**31.** Defendant Robinson waited until October 6, 2008, the following day, to file an incident report where she reported that she had discussed the patient with the shift commander, Defendant Stirewalt, and that she was expecting a call-back regarding her patient's escape risk. (Howard depo. pp. 45-46; Robinson incident report, DOC/Al-Turki0002). She reported that she reminded the shift commander that a nurse was on-call if Mr. Al-Turki's pain continued. (Robinson depo. pp. 149-150.)

**32.** Mr. Al-Turki testified that he had severe pain and then vomiting for most of the night of October 5-6, 2008 and that he had summoned help, via the intercom, on multiple occasions. (Al-Turki depo. pp. 83, 87, 93, 105-111, 118-121, 139.)

**33.** Defendant Maggard testified that he informed the graveyard shift corrections Defendants who relieved him, Sergeant Chatterton and Defendant Eberle, of Mr. Al-Turki's complaints of severe abdominal pain and the fact that Defendant Robinson had neither assessed nor treated Mr. Al-Turki. (Maggard depo. p. 91.) Defendant Lozano testified that it would have been his practice to advise the relieving living unit Defendants of a situation such as that confronting Mr. Al-Turki on the night of October 5-6, 2008. (Lozano depo. pp. 46-47.) Neither Defendant Maggard nor Defendant Lozano made entries in the shift log that would inform relieving officers of Mr. Al-Turki's circumstances the night of October 5, 2008. (Maggard depo. p. 110; Lozano depo. pp.

42-43.) Defendant Maggard did not prepare an incident report that would have informed the October 5-6, 2008 graveyard shift commander of Mr. Al-Turki's circumstances until the following night. (Howard depo. pp. 45-46). Defendant Lozano never prepared an incident report pertaining to Mr. Al-Turki's circumstances the night of October 5, 2008, despite conceding that it would have been appropriate to do so. (Lozano depo. p. 39.)

**34.** After the shift change from swing shift to graveyard shift on October 5, 2008, Mr. Al-Turki contacted the corrections Defendant in the living unit control room to again request medical attention and to speak with the graveyard shift commander and was told once again that medical personnel were refusing to see him. (Doc. 79, ¶¶ 105-09; Al-Turki depo. p. 257.) Defendant Eberle testified that he was the corrections officer working in the control room at the time Mr. Al-Turki called, but further testified that he has no recollection of Mr. Al-Turki calling him that night over the intercom. (Eberle depo. p. 93.)

**35.** Defendant Stirewalt testified that he informed Defendant Howard, the graveyard shift commander relieving him, Defendant Sutcliffe, the graveyard shift yard officer, and Defendant Rusher, the staff duty officer, of Mr. Al-Turki's medical complaints, the fact that Mr. Al-Turki had not been assessed or treated by medical personnel and that Mr. Al-Turki might require emergency medical transport to a hospital. (Stirewalt depo. pp. 182-183, 187-188, 191-193.) Defendant Howard testified that the staff duty officer had authority to correct a shift commander acting improperly. (Howard depo. pp. 18-19.) Defendant Howard further testified that any shift commander had authority to summon outside medical assistance if LCF's medical personnel were failing to perform their duties. (Howard depo. pp. 73-74.)

**36.** Defendant Chatterton, Defendant Eberle, Defendant Howard, Defendant Sutcliffe and Defendant Rusher deny that they were informed in any way of Mr. Al-Turki's situation the night of October 5, 2008. (Chatterton depo. pp. 100-08; Eberle depo. pp. 65, 67; Howard depo. pp. 88-90; Sutcliffe depo. pp. 118-19; Rusher depo. pp. 63-65.)

**37.** Defendants Chatterton, Eberle, Howard, Rusher and Sutcliffe took no actions to aid Mr. Al-Turki the night of October 5-6, 2008.

**38.** Defendant Sutcliffe testified that, notwithstanding Defendant Stirewalt's testimony to the contrary, Defendant Stirewalt did not pass on information on Mr. Al-Turki's condition at roll call and muster. (Sutcliffe depo. pp. 126, 135.) Defendant Howard testified that there was no documentation of information being passed on from the second shift to the third shift on the evening of October 5, 2008, despite Defendant Stirewalt's testimony to the contrary. (Howard depo. pp. 54, 64, 88-90)

**39.** Defendant Robinson testified that she does not recall Defendant Lozano contacting her and further denied that Defendant Maggard told her that Mr. Al-Turki had severe abdominal pains. (Robinson depo. pp. 117, 151-52.) Defendant Robinson also insisted that side pain and abdominal pain are different. (Robinson depo. pp. 117, 151, 156.) Defendant Maggard testified that he informed both Defendant Robinson and Defendant Stirewalt that Mr. Al-Turki was reporting severe abdominal pains. (Maggard depo. pp. 8, 65, 72, 79.) Defendant Maggard further testified that he informed the graveyard shift housing officers who relieved him, Defendants Chatterton and Eberle, that Mr. Al-Turki was having severe

pain and nausea; that Defendant Robinson had refused to assess Mr. Al-Turki; and that swing shift personnel had called the shift commander, who had said he would come over to Mr. Al-Turki's living unit but had not yet arrived. (Maggard depo. pp. 91-93.) Defendant Chatterton contradicts this testimony. (Chatterton depo. pp. 100-08.) Graveyard shift Defendant Eberle testified that he was not aware of Mr. Al-Turki's illness while he worked the control room until approximately 2:00 A.M. on October 6, 2008. (Eberle depo. pp. 68, 94, 98.)

**40.** At approximately 10:30 A.M., on October 6, 2008, Mr. Al-Turki had a scheduled appointment with Dr. Bloor to manage his chronic illness. (Al-Turki depo. pp. 142, 147.) He reported his experience to her, whereupon she ordered a urinalysis that revealed blood and kidney stones. (Robinson000106.) He described how Defendant Robinson had treated him to the health services administrator who told him that he had not been treated properly. (Al-Turki depo. pp. 264, 366.)

**41.** Defendant Robinson was disciplined by the CDOC for her care in this case. (Robinson depo. p. 233.) Warden Trani sent Mr. Al-Turki's attorney a letter stating that due to an oversight in clinical services, Mr. Al-Turki was not provided with the immediate medical attention that he should have received. (HAKS 00000017.) The responses to Mr. Al-Turki's grievances also acknowledged a failure on the part of clinical services to follow procedures and alluded to the discipline received by Defendant Robinson. (HAKS00000230, 232, 237, 245; Rusher depo. pp. 100, 106.)

**Opinions and Conclusions**

**42.** Mr. Al-Turki had diabetes and acute abdominal pain. (Al-Turki depo. pp. 17, 118-121, 164.) These are serious medical needs that can be life-threatening. The Defendants in this case were aware of Mr. Al-Turki's serious medical needs, but they chose to ignore them. (Al-Turki depo. pp. 118-21, 257, 345; Maggard depo. pp. 8, 65, 79, 91, 104; Lozano depo. pp. 28-32, 46-47, 60; Robinson depo. 19, 117, 123, 139, 147, 192; Stirewalt depo. 182-83, 187-88, 191-93; Lozano Response to Interrogatories pp. 4-5; incident reports, DOC/Al-Turki0001-3.) Patient complaints of side pain, abdominal pain, back pain, or flank pain may all reflect symptoms of life-threatening conditions and require medical assessment. The Defendants should have had Mr. Al-Turki assessed in person by a medical professional, and they should have consulted with a physician. A physician would likely have given Mr. Al-Turki medication for pain and would have gotten him sufficiently hydrated so that he would pass his kidney stones sooner and with less pain. As a result of Defendants' inaction, Mr. Al-Turki suffered unnecessary pain and unnecessarily severe pain for approximately eight hours. Defendants' actions with respect to Mr. Al-Turki on the October 5 and 6, 2008, fell far below the standards of correctional care and correctional health care and reflect deliberate indifference to Mr. Al-Turki's serious medical needs.

**43.** Severe pain; undiagnosed side, abdominal, flank or back-pain; and kidney stones all are examples of serious medical needs requiring immediate medical attention.

**44.** The severity of pain caused by the passage of kidney stones is often extreme. People who are not imprisoned who suffer the symptoms of kidney stones usually seek immediate medical attention and often go to emergency rooms. People suffering from kidney stones are sometimes nauseated from the associated pain. Severe pain such as that associated with kidney stones can also cause someone to lose consciousness as a means of escaping from the pain. The Motrin tablets taken by Mr. Al-Turki are inadequate to meaningfully mitigate or abate the degree of pain associated with kidney stones. (Robinson000102, 106).

**45.** Defendant Robinson breached her duty to her position, her profession, and her patient. She should have assessed and examined Mr. Al-Turki in person, and she should have followed CDOC protocols for history-taking and physical assessment. Instead, she essentially told Mr. Al-Turki to suffer through the night, rather than seeing him during the last hour of her shift. This falls far below the standard of correctional health care and reflects deliberate indifference to Mr. Al-Turki's serious medical needs.

**46.** Had Defendant Robinson assessed and examined Mr. Al-Turki in person, she would have learned, as related in the Third Amended Complaint, that Mr. Al-Turki was suffering from severe abdominal pain, nausea, and vomiting, and that Mr. Al-Turki was so beset by pain that he was at times unable to stand up. (Doc. 79, ¶¶ 28-21.) She also would have learned that due to the severity of the pain he was suffering and his ignorance of its origins, Mr. Al-Turki was terrified that he was going to die that night (Doc. 79, ¶¶ 113-14), and she could have assuaged that fear by providing accurate medical information and treatment to Mr. Al-Turki.

**47.** Defendant Robinson had been trained in the diagnosis and treatment of kidney stones and had the means available to her to alleviate Mr. Al-Turki's suffering through the administration of pain control medications and increased hydration. (Robinson depo. pp. 174-75.)

**48.** Defendants Lozano, Maggard, and Stirewalt collectively claim to have conveyed the details of Mr. Al-Turki's medical emergency to incoming graveyard shift personnel, Defendants Chatterton, Eberle, Howard, and Sutcliffe, and to the staff duty officer, Defendant Rusher. (Lozano depo. pp. 46-47; Maggard depo. p. 91; Stirewalt depo. pp. 182-83, 187-88, 191-93.) These Defendants in turn deny having any knowledge of Mr. Al-Turki's medical emergency the night of October 5-6, 2008. (Chatterton depo. pp. 100-08; Eberle depo. pp. 65, 67; Howard depo. pp. 88-90; Sutcliffe depo. pp. 118-19; Rusher depo. pp. 63-65.)

**49.** Defendant Stirewalt failed in his duties as a corrections officer and supervisor. Defendant Stirewalt did nothing to obtain medical assistance for Mr. Al-Turki, even though he knew that Defendant Robinson was refusing to see Mr. Al-Turki and even though Defendant Stirewalt had authority to summon outside medical assistance. (Stirewalt depo. pp. 15-16; Howard depo. pp. 73-74.) Defendant Stirewalt did not take steps to obtain further information on the nature, severity, and duration of Mr. Al-Turki's pain and nausea, as reported to him by his subordinates. (Stirewalt depo. pp. 129, 135, 139-40, 164.) Nor did Defendant Stirewalt encourage Defendant Robinson to see Mr. Al-Turki in person.

(Stirewalt depo. pp. 163, 207-08, 234.) He did not pass on information on Mr. Al-Turki's illness in his change of shift report, even though he should have. (Rusher depo. pp. 116, 127.) These failures on the part of Defendant Stirewalt fall far below the standard of correctional care and reflect deliberate indifference to Mr. Al-Turki's serious medical needs.

**50.** It is evident that Defendant Robinson was more focused on the perceived escape risk she associated with Mr. Al-Turki than on assessing and treating Mr. Al-Turki. (Robinson depo. pp. 16, 19, 131-34, 194-196; Stirewalt depo. pp. 178, 180; incident reports of Robinson and Stirewalt, DOC/Al-Turki0002-3.) As a health professional, and not part of custody staff, Defendant Robinson had no business using a perceived escape risk as part of her nursing decision-making, particularly since Defendant Robinson concedes that seeing Mr. Al-Turki within the confines of LCF presented no escape risk whatsoever. (Robinson depo. pp. 132, 194.) Defendant Robinson's focus on perceived escape risks rather than patient treatment was unethical, in consideration of her duty to her patient. This fell far below the standard of correctional health care and reflects deliberate indifference to Mr. Al-Turki's serious medical needs.

**51.** On the night of October 5, 2008, Defendant Robinson, having failed to examine Mr. Al-Turki or inquire into his symptoms, was not able to offer a nursing opinion as to Mr. Al-Turki's condition upon which Defendants Ballard, Maggard, Lozano, and Stirewalt could rely in deciding not to take further action to obtain medical care for Mr. Al-Turki.

**52.** Defendants did not follow CDOC policies regarding the provision of medical care to prisoners suffering pain while confined to their cells during lockdown. Defendants fell far below the standards of correctional care and correctional healthcare by failing to have Mr. Al-Turki medically evaluated. This failure reflects deliberate indifference to Mr. Al-Turki's serious medical needs.

**53.** Defendants Ballard, Lozano, Maggard, Robinson, and Stirewalt did not follow CDOC policies regarding the documentation of pass-on information to relieving officers that would convey the details of Mr. Al-Turki's medical emergency to graveyard shift personnel the night of October 5-6, 2008. Defendants fell far below the standards of correctional care and correctional healthcare by failing to take steps to ensure that incoming personnel were aware of Mr. Al-Turki's medical emergency the night of October 5-6, 2008. This failure reflects deliberate indifference to Mr. Al-Turki's serious medical needs.

**54.** Defendants Ballard, Lozano, Maggard, and Stirewalt failed in their duties to Mr. Al-Turki when they failed to obtain medical care for Mr. Al-Turki after Defendant Robinson refused to see him. This falls far below the standard of correctional health care and reflects deliberate indifference to Mr. Al-Turki's serious medical needs

**55.** Even if Defendants Ballard, Lozano, Maggard, and Stirewalt are truthful in relating that they passed on information relating to Mr. Al-Turki's medical emergency to Defendants Chatterton, Eberle, Howard, Rusher, and Sutcliffe, the mere act of notifying other corrections personnel approximately an hour-and-a-half after becoming aware that Mr. Al-Turki was experiencing a medical emergency that Defendant Robinson was refusing to

address falls far below the standards of correctional health care and reflects deliberate indifference to Mr. Al-Turki's serious medical needs.

**56.** Assuming that Defendants Lozano, Maggard and/or Stirewalt did convey the details of Mr. Al-Turki's circumstances to them on the night of October 5, 2008, Defendants Chatterton, Eberle, Howard, and Sutcliffe failed in their duties to Mr. Al-Turki when they failed to obtain medical care for Mr. Al-Turki after Defendant Robinson refused to see him. This falls far below the standard of correctional health care and reflects deliberate indifference to Mr. Al-Turki's serious medical needs.

**57.** Assuming that Defendant Stirewalt did convey the details of Mr. Al-Turki's circumstances to Defendant Rusher on the night of October 5, 2008, Defendant Rusher was deliberately indifferent to Mr. Al-Turki's serious medical needs by failing to direct Defendant Stirewalt to act to obtain medical assistance for Mr. Al-Turki and by failing to escalate Mr. Al-Turki's medical emergency and lack of care within the medical and correctional chain of command. Defendant Rusher could not rely on Defendant Robinson's claim that Mr. Al-Turki was not experiencing a medical emergency when he knew that Defendant Robinson had not herself seen Mr. Al-Turki and had made no efforts to learn any details about Mr. Al-Turki's condition and symptoms.

**58.** Faced with Defendant Robinson's refusal to see Mr. Al-Turki, the other Defendants should have taken steps to escalate Mr. Al-Turki's need for medical attention within the medical chain of command or taken action to have Mr. Al-Turki transported outside LCF to obtain medical care. By failing to do so, Defendants' conduct fell far below the standard of correctional health care. This failure reflects deliberate indifference to Mr. Al-Turki's serious medical needs.

**59.** By refusing to see Mr. Al-Turki and provide or obtain medical care for him when she knew that Mr. Al-Turki was experiencing undiagnosed pain, particularly in light of Mr. Al-Turki's known history of diabetes, Defendant Robinson was deliberately indifferent to Mr. Al-Turki's serious medical needs.

**60.** Defendants Ballard, Lozano, Maggard, and Stirewalt were not justified in relying on Defendant Robinson's statement that Mr. Al-Turki was not experiencing a medical emergency when they knew that Defendant Robinson had not herself seen Mr. Al-Turki and had made no efforts to learn any details about Mr. Al-Turki's condition and symptoms.

**61.** By failing to take further steps to ensure that Mr. Al-Turki received the immediate medical care he required, beyond informing Defendant Robinson and Defendant Stirewalt of Mr. Al-Turki's pain and request for medical care, Defendants Lozano and Maggard were deliberately indifferent to Mr. Al-Turki's serious medical needs. This failure reflects deliberate indifference to Mr. Al-Turki's serious medical needs.

**62.** By failing to escalate Defendant Robinson's refusal to see Mr. Al-Turki within the medical and correctional chains of command and by failing to take further action to ensure that Mr. Al-Turki received the medical care he required beyond discussing the matter with

Defendant Robinson, Defendant Stirewalt was deliberately indifferent to Mr. Al-Turki's serious medical needs.

**63.** The passing of kidney stones through Mr. Al-Turki's body on October 5-6, 2008, caused physical injury to his urinary tract, as evidenced by the severe pain he experienced and the presence of blood in his urine.

Sincerely,

Robert B. Greifinger, M.D.

Attachments: Resume, list of publications, fees, and list of testimony